**United States District Court**
**Middle District of Florida**
**Tampa Division**

Alejandro Roche, individually and
on behalf of all others similarly situated,

     Plaintiff,

v.

                                       Case No. _____
                                       Hon. _____

TECO Energy, Inc. and
TECO Energy Group Retirement Plan,

     Defendants.
_____

Sean Estes (FL Bar No. 55770)
Hoyer Law Group, PLLC
2801 W. Busch Blvd., Suite 200
Tampa, FL 33618
o. 813-375-3702; f. 813-375-3710
sean@hoyerlawgroup.com
*Lead Counsel for Alejandro Roche and
all others similarly situated*

Eva Cantarella (MI Bar No. P51917)
Robert Geller (MI Bar No. P34391)
Elizabeth Thomson (MI Bar No. P53579)
(all to be admitted *pro hac vice)*
Hertz Schram PC
1760 S. Telegraph Rd.
Bloomfield Hills, MI 48302
o. 248-335-5000; f. 248-3353346
ecantarella@hertzschram.com
*Proposed Special Admission Counsel for
Alejandro Roche and all others similarly
situated*

## PLAINTIFF ALEJANDRO ROCHE'S CLASS ACTION COMPLAINT

Plaintiff Alejandro Roche ("Alex" or "Roche"), by and through his attorneys, brings this Complaint on behalf of himself and all others similarly situated against TECO Energy, Inc. ("TECO") and the TECO Energy Group Retirement Plan ("Plan").

## Jurisdiction and Venue

1.     This Court has jurisdiction over the parties pursuant to §502(a), (e), and (f) of the Employee Retirement Income Security Act ("ERISA"). 29 U.S.C. §1132(a), (e), and (f).

2.     Subject matter jurisdiction exists pursuant to 29 U.S.C. §1132(e)(1).

3.     Venue is proper pursuant to 29 U.S.C. §1132(e)(2).

## Nature of the Dispute

4.     This dispute is about material omissions in the Plan's summary plan description ("SPD") that caused Roche to lose over $82,000 in lump sum pension benefits.

5.     Roche seeks to recover for himself and all others similarly situated the shortfall they experienced in their lump sum pension benefits on account of the SPD's material omissions.

## **The Parties**

Roche

6.    Roche worked for TECO (or one of its predecessors) for nearly 33 years --from March 1990 until December 2, 2022 (his last day of work for TECO).

7.    Roche's position on his last day of work was Gas Design Project Manager, which required him to design and obtain permits and approvals for gas pipe lines.

8.    At all relevant times, Roche was a "Member" of the Plan (as that term is defined in the Plan) and a "participant" in the Plan (as that term is defined in ERISA). Plan §2.12, p3 (Ex. 1); 29 U.S.C. §1002(7).

TECO

9.    TECO is an energy-related holding company based in Tampa, Florida.

10.    While TECO is not publicly traded, it is reported that in 2021 TECO had 3,713 employees, annual revenue of $2.7 billion, and revenue per employee of $738,890.   See https://www.zippia.com/teco-energy-careers-40584/revenue/ (last visited July 14, 2023).

11.    Per Article XIII of the Plan, TECO is the Plan's "sponsor" and "plan administrator" as those terms are defined in ERISA.  Plan §13.1, p76 (Ex.1); SPD p25 (Ex. 2); 29 U.S.C. §1002(16).

12.    TECO is also a "named fiduciary" under the Plan and charged with "control[ing] and manage[ing]" the Plan, which makes TECO a fiduciary under ERISA, as well.  Plan §13.1, p76 (Ex. 1); 29 U.S.C. §1002(21)(A).

13.    Among TECO's listed "responsibilities" as a named fiduciary under the Plan is to perform those "duties" required "by law."  Plan §13.4, p77 (Ex. 1).

14.    Per ERISA §104, one such duty is to provide participants in the Plan with an ERISA-compliant SPD.  29 U.S.C §1024(b)(1) ("The administrator shall furnish to each participant . . . a copy of the summary plan description . . ..")

Plan

15.    The Plan was established in 1985, amended and restated several times thereafter, most recently as of January 1, 2017, and expressly states that it intends to comply and be interpreted in accordance with ERISA.  Plan §§1.1 and 1.2, p1 (Ex. 1).

16.    Since July 1, 2001 (the "Adoption Date") the Plan has included two formulas for computing a participant's pension, one for participants who were younger than age 40 as of the Adoption Date (the "Younger Participants") and the other for participants who participated in the Plan before the Adoption Date and were age 40 or older on that date (the "Grandfathered Participants").  The SPD refers to this latter group as the "grandfathered group" or "grandfathered participants."  SPD

p2 (Ex. 2).

17.     To determine the pension of the Younger Participants, the Plan used a "pension equity" formula described in the Plan and SPD (the "PE Formula") to calculate the lump sum value of the pension and then converted such lump sum to a life annuity (the "PE Pension"), the "standard" or "normal" form of payment under the Plan.  Plan §5.1(b)(i) and §6.1(a) pp10-13, 24-25 (Ex. 1); SPD pp12-14 (Ex. 2).

18.     Because Roche and the putative class members were over age 40 on the Adoption Date, the PE Formula does not apply to them.

19.     Instead, for the Grandfathered Participants, the pension is the larger of the life annuity computed under the (i) PE Formula and (ii) formula in effect before the Adoption Date (the "Grandfathered Pension").  Plan §5.1(b)(ii), pp13-14 (Ex. 1); SPD pp2-3, 6-8 (Ex. 2).

20.     Like the PE Pension, the "standard" or "normal" form of benefit for the Grandfathered Pension is a life annuity.  Plan §6.1(a) pp 24-25 (Ex. 1); SPD pp 6, 14 (Ex. 2).

21.     Grandfathered Participants may, however, elect to receive their Grandfathered Pension in the form of a lump sum.  Plan §6.2 pp27-28) (Ex. 1)**;** SPD pp2, 14-15 (Ex. 2).

22.     Roche and the putative class members elected to take their Grandfathered Pension (the life annuity) in the form of a lump sum.

23.     This dispute concerns (i) the interest rates the Plan used to convert the Grandfathered Pension into a lump sum and (ii) the Plan's failure to disclose in the SPD (A) its lump sum calculation methodology and (B) that the interest rates employed in that methodology vary depending on the distribution date the Plan uses to calculate the lump sum.

24.     As explained below, if the Plan had disclosed in the SPD its lump sum calculation methodology and the interest rates used to compute the lump sum, Roche would have elected to receive his lump sum pension one month sooner and received nearly $83,000 more.

### General Allegations

25.     Several months before his 65th birthday (8/26/2022), Roche informed his supervisor that he would retire soon after turning age 65.

26.     Thereafter, on September 22, 2022, Roche completed a TECO Retirement Application, had his supervisor sign it on September 26, 2022, and, per the instructions in the Application, emailed it on that date to TECO's "Total Rewards Retirement Team" at Retirement@tecoenergy.com.  Ex. 3.

27.     As noted in the Application, Roche selected December 2, 2022 as his last day of work for TECO.  *Id*.

28.     Roche subsequently received three letters from TECO Energy Pension Services, each dated September 27, 2022 and attaching a chart showing his estimated

pension benefits under various annuity options and a lump sum option.  Ex. 4.

29.     The letters were prompted by Roche's request approximately two weeks earlier for pension estimate information.

30.     The first benefit estimate assumed Roche's pension would be paid December 1, 2022; the second benefit estimate assumed Roche's pension would be paid January 1, 2023; and the third benefit estimate assumed Roche's pension would be paid February 1, 2023.  Ex. 4.

31.     While the annuity amounts changed little from one month to the next, the lump sum amounts changed dramatically.

32.     For the December 1, 2022 payment date, the lump sum was estimated to equal **$482,970.55**; for the January 1, 2023 payment date, it was estimated to equal **$396,600.67**; and for the February 1, 2023 payment date, it was estimated to equal **$395,997.89**.  Ex. 4.

33.     Naturally, Roche was baffled by the lump sum decrease of more than $86,000 in the course of one month.

34.     Accordingly, and as evidenced by the following email exchanges between Roche and a TECO pension representative, Roche requested (i) the methodology used to calculate his lump sum, and (ii) that his retirement date be set for December 1, 2022 since that would clearly provide him the largest lump sum.  In response, the TECO representative informed Roche that his request was tardy because

"leadership" had decided that "team members must complete the retirement application 90 days prior to the start of retirement benefits":

> *10/26/22 2:54 pm Email from Roche to Stacey Stromsnes*
>
> Good afternoon, Stacy
>
> I wanted to follow up on my request to move up my retirement date from 1-1-2023 to 12-1-2022 because of the considerable difference in the lump sum estimates provided to me. That [sic, those] estimates were provided after I submitted the initial retirement paperwork at the end of September. My request to move up the date was initiated with Paige and she forwarded it to management for consideration. Paige has informed me the request would not meet the cut-off date, and therefore, the retirement date could not be moved up. I understand the Company requires 90 days notice of retirement, but can you briefly provide the parameters that prevent the company from accelerating the retirement date given the reason for my request?
>
> Respectfully
>
> Alex Roche
>
> *10/27/2022 12:39 pm Email from Stacey Stromsnes to Roche*
>
> Hi Alex,
> Thank you for reaching out.
> Your situation was escalated to leadership and the decision was made that team members must complete the retirement application 90 days prior to the start of retirement benefits.
>
> I can share that setting someone up for retirement is an intricate and timely process to ensure that pension, healthcare, and life insurance benefits are all in place for

the requested retirement date.

We understand this is a sensitive situation.

Please let us know if you have additional questions.

Stacey

*10/27/2022 1:00 pm Email from Roche to Stacey Stromsnes*

Hi Stacey

Thank you for the explanation.  It is a bit disappointing to discover the consideration with the payout differences based on projected interest rates around the end of the year could greatly affect the lump sum amounts.  I don't imagine its something that potential retirees know to consider when determining the retirement date.

Regards,

Alex

Ex. 5 (10/26/2022 & 10/27/2022 emails between Roche and Stacey Stromsnes, a TECO Health and Retirement Manager).

35.    On November 18, 2022, in response to Roche's request for an explanation as to how his estimated pension lump sums were calculated, Deirdre Gilmore, a TECO Senior Retirement Analyst, sent Roche an email attaching page 17 of the SPD and advising that, per that page, "the basis for the lump sum calculation" was "IRS Code Section 417(e)."  *See* Ex. 6 (11/2022 through 12/2022 email exchanges between Roche and Gilmore).

36.    The part of page 17 of the SPD that references Code §417(e) reads <u>in its</u> <u>entirety</u> as follows:

### CALCULATION OF OPTIONAL FORMS OF PAYMENT

Optional forms of payment under the current formula, and effective January 1, 2017, under the grandfathered formula, are based on the interest rate and mortality table found in Internal Revenue Code Section 417(e).

SPD p17 (Ex. 2).

37.    This language in the SPD does not identify any specific interest rate or mortality table for computing pension lump sums, much less quote Code §417(e) or tell participants how to find the statute.

38.    The quoted language from page 17 of the SPD merely states that lump sums are "based on" an interest rate and mortality table "found" in Code §417(e), but no interest rate or mortality table appears in Code §417(e) which reads in full as follows:

**(e) Restrictions on cash-outs.**
 **(1) Plan may require distribution if present value not in excess of dollar limit.**
A plan may provide that the present value of a qualified joint and survivor annuity or a qualified preretirement survivor annuity will be immediately distributed if such value does not exceed the amount that can be distributed without the participant's consent under section 411(a)(11). No distribution may be made under the preceding sentence after the annuity starting date unless the participant and the spouse of the participant (or where the participant has died, the surviving spouse) consents in writing to such distribution.

**(2) Plan may distribute benefit in excess of dollar limit only with consent.** If--

> **(A)** the present value of the qualified joint and survivor annuity or the qualified preretirement survivor annuity exceeds the amount that can be distributed without the participant's consent under section 411(a)(11), and
>
> **(B)** the participant and the spouse of the participant (or where the participant has died, the surviving spouse) consent in writing to the distribution,

the plan may immediately distribute the present value of such annuity.

**(3) Determination of present value.__**

> **(A) In general.** For purposes of paragraphs (1) and (2), the present value shall not be less than the present value calculated by using the applicable mortality table and the applicable interest rate.
>
> **(B) Applicable mortality table.** For purposes of subparagraph (A), the term "applicable mortality table" means a mortality table, modified as appropriate by the Secretary, based on the mortality table specified for the plan year under subparagraph (A) of section 430(h)(3) (without regard to subparagraph (C) or (D) of such section).
>
> **(C) Applicable interest rate.** For purposes of subparagraph (A), the term "applicable interest rate" means the adjusted first, second, and third segment rates applied under rules similar to the rules of section 430(h)(2)(C) (determined by not taking into account any adjustment under clause (iv) thereof) for the month before the date of the distribution or such other time as the Secretary may by regulations prescribe.
>
> **(D) Applicable segment rates.** For purposes of subparagraph (C), the adjusted first, second, and third segment rates are the first, second, and third segment rates which would be determined under section 430(h)(2)(C) (determined by not taking into account any adjustment under clause (iv) thereof) if section 430(h)(2)(D) were applied by substituting the average yields for the month described in subparagraph (C) for the average yields for the 24-month period described in such section.

26 U.S.C. §417(e).

39.    Clearly, no one, much less the average participant, could ascertain from this Code §417(e) language the interest rate or mortality table the Plan uses to compute optional lump sum pension amounts.

40.    To add to the confusion, Gilmore's November 18, 2022 email to Roche further advised that TECO "looked back" to the August 2021 "segment rates" under Code §417(e) to compute lump sums payable in 2022, and "looked back" to the August 2022 "segment rates" under Code §417(e) to compute lump sums payable in 2023.  Ex. 6 at p2.

41.    Gilmore explained that the August 2021 "segment rates" were 0.66%, 2.50%, and 3.12%, while the August 2022 rates were 3.79%, 4.62%, and 4.69%-- significantly higher than the August 2021 segment rates.  *Id.* at pp2-3.

42.    To enable Roche to confirm the segment rates in August 2021 and August 2022, Gilmore provided Roche with the following link, which took him to an IRS website that lists Code §417(e) segment rates for each month from 2008 to the present:

> https://www.irs.gov/retirement-plans/minimum-present-value-segment-rates/ (last visited July 14, 2023).

43.    However, the SPD neither provides this link nor discloses any "lookback" month for selecting segment rates for computing pension lump sums payable under the Plan.

44.    Nonetheless, Gilmer maintained that the SPD's scant reference to Code §417(e) meant TECO could use the August 2021 segment rates for computing lump sums paid in 2022 and the August 2022 segment rates for computing lump sums paid in 2023:

> *11/18/2022 email from Gilmore to Roche*
>
> . . . If your financial advisor is looking for the specific rates used under IRS Code Section 417(e)(e) [sic, (3)]: TECO selected the 4-month lookback option for the rate. This means that, for a given calendar year, the August rates from the prior year are used. In other words:
>
> For 2022, the August 2021 rates were used for lump sums. Those rated are: 0.66%, 2.50% and 3.12%. These are segment rates, meaning the first is used to discount the first 5 years of payments, the 2nd for the next 15 years and the 3rd thereafter.
>
> For 2023, the August 2022 rates will be used for lump sums: 3.79%, 4.62% and 4.69%.
>
> These rates are published on the IRS website.

Ex. 6 at p2.

45.    Unfortunately, the SPD, Code §417(e), and the link Gilmore provided nowhere reference the information discussed in Gilmore's emails to Roche (including anything about "look back") except for the segment rates themselves.

46.    In fact, page 17 of the SPD refers to a single Code §417(e) "interest rate" [not "rates", plural] and does not even remotely suggest that the Code §417(e)

"interest rate" is actually a set of three "segment" rates *that change every month*.

47.    Therefore, the average participant would have no reason to even *think* he or she needed to examine Code §417(e) after reading page 17 of the SPD.

48.    But if a participant *did* examine Code §417(e), he or she would not find a list of "segment" rates or anything about a "lookback" month.

49.    The list of Code §417(e) segment rates at the link Gilmore emailed Roche does, however, reveal that they generally steadily increased from January 2021 to the present.

50.    There exists an inverse relationship between the interest rate utilized to calculate the present value of a pension annuity and the resultant lump sum; that is, the higher the rate, the smaller the lump sum; the lower the rate, the larger the lump sum.

51.    Therefore, using TECO's "lookback" methodology in an increasing segment rate environment (as occurred in 2022) would necessarily mean that a lump sum paid or payable in 2023 would be smaller than if it were paid in 2022.

52.    In Roche's case, the difference exceeded $82,000, as his lump sum check, dated January 3, 2023, equaled $400,661.11 (Ex. 7), whereas TECO estimated that his lump sum on December 1, 2022 would equal $482,970.55.  Ex. 4.

53.    The SPD should have disclosed the Plan's lump sum calculation methodology and the financial impacts of that methodology because, without this

information, a participant could not make an informed decision as to when to retire.

54.     Obviously, if Roche had known that higher interest rates would be used to compute a lump sum paid to him in 2023 he would have ceased work and submitted his Retirement Application sooner to ensure that his lump sum would be calculated as paid or payable in 2022 (i.e., using the August 2021 segment rates rather than the higher August 2022 segment rates).

55.     According to the Department of Labor ("DOL"), SPDs are the "[p]rimary vehicle for informing participants and beneficiaries about their plan and how it operates." *See* DOL "Reporting and Disclosure Guide for Employee Benefit Plans" (Guide) at the following link:

> https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/reporting-and-disclosure-guide-for-employee-benefit-plans.pdf (last visited July 14, 2023).

56.     Therefore, SPDs "[m]ust be written for the average participant," be sufficiently comprehensive to apprise participants of their "benefits, rights and obligations under the plan," and "accurately reflect the plan's contents."  Guide at page 2.

57.     These requirements are codified in ERISA §102 (29 U.S.C. §1022), and a DOL regulation cited in the Guide elucidates the mandate as follows:

(a) Method of presentation. <u>The summary plan description shall be written in a manner calculated to be understood by the average plan participant and shall be sufficiently comprehensive to apprise the plan's participants and beneficiaries of their rights and obligations under the plan</u>. In fulfilling these requirements, the plan administrator shall exercise considered judgment and discretion by taking into account such factors as the level of comprehension and education of typical participants in the plan and the complexity of the terms of the plan.  Consideration of these factors will usually require the limitation or elimination of technical jargon and of long, complex sentences, the use of clarifying examples and illustrations, the use of clear cross references and a table of contents.

(b) General format.  The format of <u>the summary plan description must not have the effect of misleading, misinforming or *failing to inform* participants and beneficiaries.  Any description of exception, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant</u>. . . .

29 CFR §2520.102-2 (emphasis added).

58.     Significantly, another DOL regulation cited in the Guide and enforcing ERISA §102 <u>requires SPDs to "clearly identify" the circumstances that may result in a loss or reduction of benefits</u>.  29 CFR §2520.102-3(l).

59.     The SPD's failure to disclose the Plan's lump sum calculation methodology for Grandfathered Participants or explain the interest rate factors that influence the amount of their pension lump sum in an increasing segment rate environment violated these SPD protections and effectively cost Roche over $82,000

in lost lump sum pension benefits.

60.    The Plan likewise does not adequately disclose the lump sum calculation methodology for Grandfathered Participants.

61.    Even if the Plan *did* include such information, no participant would have known of it because, as Gilmore informed Roche when he requested a copy of the Plan: "We confirmed with legal -- the plan document is confidential and cannot be mailed outside of TECO" and "we cannot email copies of the full plan document . ..." Ex. 6 at pp1-2 of Gilmore's emails to Roche.

### Exhaustion of Administrative Remedies

62.    On February 23, 2023, Roche submitted his claim for additional pension benefits to the Plan Administrator (TECO) via Certified Mail, attaching thereto most of the Exhibits cited in this Complaint (the "Claim").  Ex. 8.

63.    TECO signed the postal receipt for the Claim on February 27, 2023.  Ex. 9.

64.    Under DOL regulations governing ERISA claims procedures, TECO had 90 days to issue a decision on Roche's Claim.  29 CFR §2560-503-1(f).

65.    Accordingly, the administrative decision on Roche's Claim was due May 28, 2023.

66.    As of June 13, 2023 (106 days after TECO signed for the Claim), Roche had heard nothing from TECO.

67.    Therefore, on that date, Roche sent a follow-up letter to TECO by Certified Mail requesting that TECO immediately send him the decision on his Claim and offering to accept the decision by email.  Ex. 10.

68.    Although TECO received Roche's follow-up letter on June 20, 2023 (Ex. 11), as of the filing of this Complaint, Roche has heard nothing from TECO about his administrative Claim.

69.    Under these circumstances, Roche should be deemed to have exhausted the Plan's administrative remedies or be excused from any exhaustion requirement as it clearly would be futile for him to continue his efforts to obtain a response from TECO.

## Class Action Allegations

70.    Roche brings his Claim on behalf of the following individuals ("the Class"):

> All Grandfathered Participants who in 2023 received or will receive an optional pension lump sum from the Plan calculated using the Code §417(e) segment rates for August 2022.

71.    The members of the Class are so numerous that joinder is impracticable.

72.    On information and belief, the Class exceeds 50 members, making joinder of all members impracticable.

73.    There exist questions of law or fact common to all Class members, including, without limitation, the following:

(A) Whether the SPD failed to disclose the Plan's methodology for computing Grandfathered Participants' pension lump sums;

(B) Whether the SPD failed to disclose that in computing Grandfathered Participants' pension lump sums the Plan would use Code §417(e) "segment" rates;

(C) Whether the SPD failed to disclose that in computing Grandfathered Participants' pension lump sums the Plan would "look back" and select the Code §417(e) "segment" rates for August of the year before the year of distribution;

(D) Whether the SPD failed to disclose that in an increasing segment rate environment if a Grandfathered Participant receives his/her optional lump sum in the upcoming year it may be significantly less than if he/she receives the lump sum in the current year; and

(E) Whether the SPD violated ERISA §102.

74.    Roche's Claim is typical of the claims of the other Class members because all received the SPD and all had or will have their lump sums reduced by the

Plan's use of the Code §417(e) segment rates for August of 2022.

75.     Roche will fairly and adequately represent the members of the Class and protect their interests, as his interests are coincident with, and not antagonistic to, those of the other Class members.

76.     In addition, the attorneys for the proposed Class are experienced in ERISA pension plan class action litigation.

77.     Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

78.     The questions of law or fact common to the Class members predominate over any questions affecting only individual Class members.

79.     Litigating Roche's Claim as a class action is superior to other available methods for fairly and efficiently adjudicating the controversy in that the Class members injured by Defendants' conduct would not be compensated for their injuries in the absence of a class action as it would be too expensive for them to individually prosecute the Claim solely on their own behalf.

80.     Even if individual members of the Class could afford to prosecute the Claim alone, the Court would be inundated with myriad lawsuits involving identical issues.

81.    Individual litigation magnifies the delay and expense to all parties and to the court system of resolving the controversies engendered by Defendants' actions.

82.    By contrast, a class action presents fewer management difficulties and provides the benefits of unitary adjudication, economies of scale and comprehensive supervision by a single court.

83.    Lastly, the management of this class action will not be difficult, as little contact with individual Class members will be necessary; Defendants' conduct, and not that of the Class members, represents the primary issue in this litigation.

## Count I - Violation of ERISA §102

84.    Roche realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully restated herein.

85.    Pursuant to ERISA §502(a)(3), a participant or beneficiary may bring a civil action to "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan." 29 U.S.C. §1132(a)(3).

86.    Roche brings this Count I under ERISA §502(a)(3) for violation of ERISA §102.

87.    Under ERISA §102, SPDs must state the plan's manner of operation in clear and understandable terms.  29 U.S.C. §1022(a).

88.    Further, the SPD must be "written in a manner calculated to be understood by the average plan participant" and be "sufficiently accurate and comprehensive to reasonably apprise such participants of their rights and obligations under the plan."  29 U.S.C. §1022(a).

89.    If there will be any loss of benefits, §102 directs that the SPD describe the circumstances engendering that loss.  29 U.S.C. §1022(b).

90.    DOL regulations enforcing ERISA §102 emphasize that, in fulfilling these SPD requirements, plan administrators must consider the complexity of the plan and the "average participant's" level of comprehension, and should usually use clarifying examples and illustrations and avoid using technical jargon.  29 C.F.R. §2520.102-2(a).

91.    Of paramount importance is that the SPD "must not have the effect of misleading, misinforming, *or failing to inform* participants and beneficiaries."  29 C.F.R. §2520.102-2(b) (emphasis added).

92.    Accordingly, "[a]ny description of exceptions, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure, or otherwise made to appear unimportant" (*id*.) and, as noted, the SPD must identify the circumstances that may result in a "loss" or "reduction" in benefits.  29 C.F.R.

§2520.102-3(l).

93.    As earlier noted, pursuant to ERISA §104, plan administrators are required to furnish participants with an ERISA-compliant SPD.    29 U.S.C. §1024(b)(1).

94.    Here, that responsibility fell on TECO not only because it is the named Plan Administrator, but also because it is a named fiduciary under the Plan and a fiduciary under ERISA.  Plan §§13.1 and 13.4, pp76-77 (Ex.1); SPD p25 (Ex. 2); 29 U.S.C. §1002(21)(A).

95.    ERISA §404 dictates that plan fiduciaries discharge their duties with respect to the plan "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of providing benefits to participants and their beneficiaries."  29 U.S.C. §1104(a).

96.    Here, TECO did just the opposite by providing participants with a materially defective SPD that caused Roche and the other Class members to lose substantial benefits.

97.    Given the significant impact of interest rates on lump sum present values, it was incumbent upon TECO to ensure the SPD explained that in computing Grandfathered Participants' pension lump sums (i) TECO would "look back" and select the Code §417(e) segment rates for August of the year before the distribution year, and (ii) if segment rates are increasing in any given year and the lump sum is

paid in the following year, it may be significantly reduced.

98.    Unfortunately for Roche and the other Class members, the SPD TECO provided them failed to explain any of this.

99.    Therefore, TECO violated ERISA §102's disclosure requirements, as well as ERISA §404's fiduciary duties, by failing to include this highly material information in the SPD, causing Roche and the other Class members to lose substantial benefits.

100.    Wherefore, Roche asks this Court to issue an Order that--

(i) instructs TECO to--

> (A) re-compute his and the Class members' lump sum pensions using the August 2021 segment rates;

> (B) order the Plan to pay him and the Class members the difference between that amount and the amount they received under the August 2022 segment rates, plus all post-judgment interest required under 28 U.S.C. §1961; and

> (C) order the Plan to pay him and the Class members all costs and attorneys' fees incurred in prosecuting the Claim in this lawsuit, as permitted under ERISA §502(g), 29 U.S.C. §1132(g).

(ii) equitably surcharges TECO for all pension losses he and the Class members suffered on account of the defective SPD that violated ERISA §102, as permitted under ERISA §502(a)(3), including prejudgment interest on those losses and post judgment interest as required under 28 U.S.C. §1961; and

(iii) grants any other relief the Court deems appropriate and permissible under ERISA §502(a).

101.    Roche further asks the Court to certify the proposed Class, appoint him as the Class representative, and appoint the Proposed Special Admission Counsel as attorneys for the Class.

Respectfully submitted July 14, 2023
/s/ Sean Estes
Sean Estes (FL Bar No. 55770)
Hoyer Law Group, PLLC
2801 W. Busch Blvd., Suite 200
Tampa, FL 33618
o. 813-375-3702; f. 813-375-3710
sean@hoyerlawgroup.com
*Lead Counsel for Alejandro Roche and all others similarly situated*

Eva Cantarella (MI Bar No. P51917)
Robert Geller (MI Bar No. P34391)
Elizabeth Thomson (MI Bar No. P53579)
(all to be admitted *pro hac vice*)
Hertz Schram PC
1760 S. Telegraph Rd.
Bloomfield Hills, MI 48302
o. 248-335-5000; f. 248-3353346
ecantarella@hertzschram.com
*Proposed Special Admission Counsel for Alejandro Roche and all others similarly situated*